(No. 36302.—

The People of the State of Illinois, Defendant in Error, *vs.* Cladie B. Wilson *et al.,* Plaintiffs in Error.

*Opinion filed March 23, 1962.—Rehearing denied May 23, 1962.*

STEPHEN LEE, R. EUGENE PINCHAM, and CHARLES B. EVINS, all of Chicago, for plaintiffs in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The defendants, Cladie B. Wilson and Louis Washington, were indicted for the unlawful sale of narcotic drugs to Inez Anderson, and they were found guilty after a trial before a judge of the criminal court of Cook County. Cladie Wilson was sentenced to the penitentiary for a term of ten to eleven years and Louis Washington was sentenced to life imprisonment as an habitual criminal. They prosecute this writ of error to review their convictions. The defendant Wilson asserts that the State's failure to produce Ruth Killingsworth, an informer for the Federal bureau of narcotics, deprived her of a fair trial, and that the evidence establishes her defense of entrapment. The defendant Washington contends that the evidence was insufficient to support his conviction, that the Habitual Criminal Act is unconstitutional, and he was erroneously sentenced under it.

It is undisputed that the defendant Wilson received $150 or $160 in Ruth Killingsworth's apartment on September 8, 1958, and that she left the apartment and returned a few hours later with a package that contained heroin. Exactly what occurred in the apartment is disputed. The only persons present were Inez Anderson, a city of Chicago police officer on loan to the Federal bureau of narcotics; Ruth Killingsworth, who had been a special employee, or informer, for the Federal bureau of narcotics for about nine months, and the two defendants. Of these persons, only Officer Anderson and the defendant Wilson testified.

Both Officer Anderson and defendant Wilson agree that Anderson handed the money to the defendant and that on her return to the apartment the defendant handed the package of heroin to Anderson. They differ as to the circumstances. The officer testified that on the first visit she was lying on the couch, wearing dark glasses, and that a person could have thought that she was asleep. She said that after some conversation between Killingsworth and Wilson, Killingsworth said to the officer, "Get up and give the girl your money. You want the stuff, why don't you get up and give the girl your money?" She also testified that when the defendants returned the defendant Wilson handed her the package containing heroin while Ruth Killingsworth was talking on the telephone.

The defendant Wilson testified that she had known Ruth Killingsworth for nine or ten years, and considered her a good friend. The two women patronized the same dressmaker and had gone out socially together. On many occasions the defendant had loaned her money. Killingsworth had been a narcotics addict for seven or eight years, and the defendant had seen her on many occasions when she was suffering from the withdrawal of narcotics. Wilson testified that on three separate occasions in 1958, prior to

September 8, Ruth Killingsworth had asked the defendant to purchase narcotics for her, but that on each occasion she refused. She testified that on September 8 Killingsworth called her four times. Each time Killingsworth represented herself as suffering withdrawal pains that were becoming progressively more severe. "She said she couldn't hardly move and she and her husband were in agony and pain." Each time she asked the defendant to get her a package of heroin. She said that the defendant was her last resort, since she was unable to buy heroin herself because people said she was "snitching." Wilson testified that she refused Killingsworth's first three requests on September 8, but finally agreed to go to her apartment when she called the fourth time.

When the two defendants went to Killingsworth's apartment on September 8, 1958, they found Killingsworth lying on the floor watching television and acting as though she was in agony. Officer Anderson was lying on a couch apparently asleep. After a brief conversation between Wilson and Killingsworth, the latter directed Officer Anderson to give Wilson the money. Officer Anderson then handed the money to Wilson. She testified that she returned to her own apartment and telephoned one Bernice Mackey, who brought her an ounce of heroin in return for which she gave Mackey the money that had been handed to her by Anderson. She testified that when she returned with the package of heroin Ruth Killingsworth was talking on the telephone and told Officer Anderson to take the package and that the defendant then gave the package to Officer Anderson.

Wilson testified that Louis Washington, her codefendant, was her friend and was also an addict, and that she bought $25 to $30 worth of narcotics a week from Bernice Mackey, which she rationed out to Washington "to try to keep him down and keep him off of it as much as pos-

sible." She was familiar with Washington's sufferings when he was deprived of narcotics.

Wilson testified further that she did not use narcotics herself, that she dealt with them only to the extent of her purchases for Washingon, and that she had obtained the package of heroin involved in this case only because of the desperate need represented to her by her friend, Ruth Killingsworth. She stated that she had made no profit on the transaction and wanted none because she was acting solely out of sympathy. She urges that these facts constitute entrapment as a matter of law, citing *Sherman* v. *United States,* 356 U.S. 369, 2 L. ed. 2d 848. The State answers by pointing out that the testimony of Officer Anderson showed nothing more than an illegal narcotics sale by Wilson to Officer Anderson. The conflict in the evidence could have been resolved if Ruth Killingsworth had been available as a witness, but she was not.

In response to the defendants' inquiries as to the whereabouts of Ruth Killingsworth, the State had replied by giving her address as the local office of the Federal bureau of narcotics. Before the trial the attorney for the defendants moved for the entry of an order directing the prosecution to produce Ruth Killingsworth so that he might interview her in order to prepare his defense, to prepare for cross-examination of the State's witnesses, and to call, or request the court to call, Ruth Killingsworth as a witness. The prosecution resisted the motion, and the court reserved his ruling until the evidence had been heard.

At the trial one of the Federal agents testified that on or about September 14, 1958, he went to Ruth Killingsworth's apartment, and drove her, and a man named Fred Stein whom he described as her "husband," to a railroad station in a government car. There he watched them buy tickets, and put them on a train for Forth Worth, Texas. He further testified that he gave her $60 at this time and

had given her $700 a few days earlier. He acknowledged that he was acting in his official capacity and that he used official funds. At the conclusion of the testimony the defendants' motion was renewed, and it was then denied upon the ground that the court did not see "how the production of this witness could help either defendant."

To the defendants' contention that the conduct of the Federal agents deprived her of a fair trial, the State replies that it is not required to call all material witnesses to the commission of a crime. (*People* v. *Aldridge,* 19 Ill.2d 176; *People* v. *Izzo,* 14 Ill.2d 203, 213.) That is true, but there is more here than a determination to call, or not to call, a particular witness. Here a crucial witness was deliberately sent beyond the jurisdiction of the court, and where, as here, all of the evidence is secured by or under the direction of Federal agents, the State can not divorce itself from their conduct when it undertakes a prosecution. *Cf. Roviaro* v. *United States,* 353 U.S. 53, 1 L. ed. 2d 639.

The fact that the prosecution itself brought about the absence of the witness makes it unnecessary to consider the State's contention that the defendant did not show that it could compel her return. We may point out, however, that in a case in which Federal narcotic agents deliberately deferred the prosecution until an informer had voluntarily left the jurisdiction, the Supreme Court of California set aside the conviction, saying: "The record does indicate that the police did not arrange for Stough's absence. The critical question, however, is not necessarily one of improper conduct in bringing about Stough's absence, but rather, whether the defendant's conviction resulted from some form of trial in which his essential rights were disregarded or denied." *People* v. *Kiihoa,* (53 Cal. 2d 748), 349 P.2d 673.

In this State, and upon this record, there can be no question as to the quality of the conduct of the Federal agents. At least since 1877 the Criminal Code has provided: "Who-

ever, by hiring, persuasion, or otherwise, induces any witness in any criminal cause, or any person having knowledge of any fact tending to show the guilt or innocence of any person suspected or charged with having committed a crime, to leave the state or secrete himself so that he cannot be produced as a witness at any examination or trial of the person so suspected or charged, or whoever having knowledge of any fact tending to show the guilt or innocence of any person suspected or charged with having committed a crime, takes any money or valuable consideration or gratuity, or promise therefor, upon an agreement or understanding, expressed or implied, not to testify or give evidence of such fact, or to leave the state, or to secrete himself so that he cannot be produced as a witness at any examination or trial of the person so suspected or charged shall be fined not exceeding $1,000 or confined in the county jail not exceeding one year, or both." Ill. Rev. Stat. 1959, chap. 38, par. 580.

In *Thompson* v. *People*, 410 Ill. 256, a convicted defendant alleged, by motion *coram nobis,* that the sheriff had threatened two witnesses subpoenaed by the defendant, told them to get out of town until after the defendant's trial, and then returned the subpoenas "not found." This court held that the allegations of the motion raised a constitutional issue, saying, "We believe, if appellant has been the victim of the suppression of evidence which he alleges in his petition, that he has been deprived of his constitutional right to due process of law." 410 Ill. at 264.

The State seeks to distinguish the *Thompson* case by arguing that the "affirmative, willful" conduct found in that case is not present here. But that argument fails. In this case an agent of the Federal bureau of narcotics testified that he gave Ruth Killingsworth $760 of government funds, transported her in a government car to the train which was to take her out of this jurisdiction, supervised the purchase of her ticket, and put her on the train. The prosecution

then answered all of the defendants' inquiries as to her whereabouts by giving her address as the office of the Federal bureau of narcotics. The conduct admitted here was no less affirmative and wilful than the conduct alleged in the *Thompson* case.

Entrapment is a recognized defense to a criminal prosecution, (*People* v. *Strong*, 21 Ill.2d 320; *Sherman* v. *United States*, 356 U.S. 369, 2 L. ed. 2d 848,) and the defendant was entitled to a fair hearing on that defense. Moreover, the testimony of Killingsworth as to what was said during the defendants' visits to her apartment was critical.

We hold, therefore, that the conduct of the Federal agents in sending her out of the jurisdiction, and the ruling of the trial court in denying the defendants' motion to compel her production, deprived them of a fair trial. Since this conclusion vitiates the conviction of both defendants, it is unnecessary to discuss any of the other grounds asserted by either of them.

The judgment of the criminal court of Cook County is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*